## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LUCILLE CARROLL,**

       **Plaintiff,**

      **v.**

**PRUDENTIAL INSURANCE
COMPANY OF AMERICA,**

       **Defendant.**

**Case No. 2:08-cv-737**

**JUDGE EDMUND A. SARGUS, JR.**

**MAGISTRATE JUDGE TERENCE P. KEMP**

## OPINION AND ORDER

This ERISA benefits case is before the Court for consideration of cross motions for judgment on the administrative record[1] filed by Plaintiff Lucille Carroll ("Carroll") and Defendant Prudential Insurance Company of America ("Prudential"). (Documents 20, 21.) For the reasons that follow, the Court **GRANTS** Carroll's motion and **DENIES** Prudential's motion.

### I.

As a former employee of Wexner Heritage Village, Carroll is a participant in the Wexner Heritage Village Long-Term Disability Plan, of which Prudential is the insurer. (Compl. ¶¶ 1, 2; Answer ¶¶ 1, 2.) Suffering from chronic pain, Carroll stopped working on July 25, 2006 and applied for benefits under the Long-Term Disability Plan (the "Plan") in August of 2006, which Prudential denied.[2] (Compl. ¶ 7; R.[3] 129, 124–41, 226.) Carroll appealed the decision twice (R. 27, 58), and Prudential affirmed the denial following each of two reconsiderations (R. 197, 210, 220, 235). Prudential's decisions and the underlying records are described more fully below.

---

[1] While Defendant characterizes its motion as seeking summary judgment, it is more appropriately captioned as a motion for judgment on the administrative record. *See Egger v. UNUM Life Ins. Co. of Am.*, No. 2:07-cv-1244, 2009 U.S. Dist. Lexis 90100, *1–2 n.1 (S.D. Oh. Sept. 28, 2009).

[2] Carroll was also a participant in, and applied for benefits under, a similar plan for short-term disability benefits. She concedes that Prudential correctly denied her claim for short-term disability benefits because that plan does not cover work-related injuries. (Compl. ¶¶ 1, 2; Answer ¶¶ 1, 2; R. 124–41, 143, 213–14; Pl.'s Mem. 6 n.2.)

[3] The administrative record is filed in this case as Document 27-1.

## A.    Medical History

Carroll injured her back while helping to lift a patient in August of 2002.  (R. 20–21.)

According to a report prepared by Dr. Robert Sparks, an x-ray taken on September 30, 2002

showed the following:

- Decrease of the normal lumbar lordosis.
- Moderate posterior weight bearing of the lumbar spine.
- Moderate IVF narrowing at L5-S1 level.
- Extension malposition of L4 on L5.
- Mild retrolisthesis of L3 on L4 and L4 on L5.
- Mild to moderate degenerative disc narrowing noted at L4 and L5.
- Mild lateral osteophytic formation at L3-L5.

(R. 73.)  After making these and other observations, Dr. Sparks concluded that Carroll suffered

from "[p]ostural alterations and rotational malpositions suggesting papa spinal muscular

guarding"; "[a]ltered biomechanics of the cervical, thoracic, and lumbar spine";

"[i]ntersegmental joint malposition of the cervical, thoracic, and lumbar spine"; and "[m]ild to

moderate degenerative joint disease at C7 and L5." (*Id.*)

On June 15, 2005, Dr. Joseph Trapp ordered a chest x-ray to diagnose a cough; the

radiology report by Fairfield Medical Center noted that Carroll suffered from "a convex right

scoliotic curvature of the lower thoracic spine." (R. 101.)

On June 29, 2005, Dr. Stephen Altic, Carroll's primary care doctor, ordered a lumbar

MRI at Cleveland Clinic STAR Imaging.  The MRI report showed the following:

> There is mild to moderate [*sic*] with scoliosis. No acute vertebral body compression or bone marrow replacement is noted.
>
> T12/L1: There is mild disc dessication and annular bulge least pronounced centrally effacing the thecal sac and foramina. The facet joints appear normal.
>
> L1/L2: There is mild disc dessication. The facet joints appear normal.
>
> L2/L3: There is mild disc dessication and annular bulge least pronounced centrally effacing the foramina. The facet joints appear normal.
>
> L3/L4: There is disc dessication and annular bulge with mild left foraminal encroachment. There is mild facet joint disease.

2

L4/L5: There is annular bulge with mild encroachment on the thecal sac and foramina. There is mild facet joint disease.

L5/S1: There is degenerative disc disease with endplate reactive changes. A degenerative broadbase protrusion is noted with mild spinal and foraminal encroachment. There is mild facet joint disease.

The visualized spinal cord appears normal.

IMPRESSION: A levoscoliosis. Multilevel degenerative disease. L3/L4 and L5/S1 mild left foraminal stenosis.

(R. 77–78, 86–87.)

On August 2, 2005, Dr. Altic wrote a letter opinion to Attorney Philip Fulton, apparently for the purpose of a claim arising out of Carroll's 2002 back injury. (R. 79–80.) Dr. Altic noted that Carroll suffered from multilevel disc desiccation; degenerative disc disease; disc protrusion with left foraminal encroachment, which the doctor noted "is consistent with her clinical signs and symptoms"; and facet arthropathy. (*Id.*)

In August of 2005, Dr. Altic referred Carroll to Dr. Mark A. White for a neurosurgical spine consultation. Carroll described her pain to Dr. White as 70% in her back and 30% down the leg, stating that her back pain increased with prolonged sitting, standing, bending, lifting, and walking. (R. 81–82, 84.) She was taking only ibuprofen for pain at that time although she rated her average daily pain as eight out of ten. (R. 81–82.) On a patient questionnaire, she indicated that she had received manipulation/chiropractic treatment and physical therapy but her symptoms were staying the same or had gotten worse. (R. 84.) She also indicated that her pain regularly kept her from performing chores and exercise. (R. 84.) Dr. White's physical examination was mostly normal, but he noted that Carroll had "tenderness from L3 to S1 with spasm." Dr. White also reviewed the MRI dated June 29, 2005 and found that it showed multilevel spondyloarthropathy, bilateral facet disease, and disc protrusions causing foraminal stenosis. (R. 81–82.)

Dr. White reported the following impressions to Dr. Altic:

1.) Back pain with mechanical type features, R/O secondary to internal disc derangement, L3-4, L4-5 and L5-S1. With a high degree of reasonable medical certainty, I feel this is a chronic condition of degenerative disc disease, however, a direct and aggravation due to her work injury.

2.) Left lower extremity radiculopathy[4] secondary to foraminal stenosis at L3-4, L4-5 and L5-S1 due to disc protrusion, 722.1. With a high degree of reasonable medical certainty, I feel this is a direct relation to her work injury.

3.) Diffuse facet arthropathy bilaterally L3-4, L4-5 and L5-S1. This is a chronic, pre-existing condition, however, aggravated by a work injury.

(R. 82.) Dr. White stated that he would like to obtain additional scans of Carroll's spine and recommended that Carroll try back stabilization techniques, stretching, and strengthening exercises. He also suggested that she may benefit from a trial of facet blocks but stated that she "may need a provocative discography[5] to help clarify her pain generator since the majority of her symptoms seem to be axial and mechanical back pain[6] and not radiculopathy." (*Id.*)

Dr. Altic again treated Carroll for her back pain on February 1, 2006. While Dr. Altic's notes are largely illegible (R. 48–50, 102–10), Prudential's phone records indicate that Dr. Altic's office staff interpreted Dr. Altic's notes for the February 1, 2006 examination as follows:

chronic low back pain, getting worse
increased left leg radiculopathy
pain penetrating into foot
O: lumbar [range of motion]

---

[4] A radiculopathy occurs when a spinal disc herniates backward or to the side and impinges on or "pinches" a spinal nerve and/or the spinal cord. A disc herniation occurs when the outer rim of a disc (the "annulus") weakens or tears, causing the gelatinous inner core of the disc (the "nucleus") to push outward. THE CLEVELAND CLINIC FOUNDATION, *Pinched Nerves*, http://my.clevelandclinic.org/disorders/radiculopathy/hic_pinched_nerves.aspx (last accessed May 13, 2010).

[5] A provocative discography is a type of diagnostic imaging test for which a contrast agent is injected into the spine. Omar El Abd, Zacharia Isaac, Stefan Muzin, & Joseph Walker, III, *Discography in practice: a clinical and historical review*, CURR REV MUSCULOSKELET MED., June 2008, at 69–83, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2684219/?tool=pubmed.

[6] "Mechanical back pain implies the source of pain is in the spine and/or its supporting structure," when "[t]he surrounding muscles and ligaments may become inflamed and irritated." THE CLEVELAND CLINIC FOUNDATION, *Acute Mechanical Back Pain*, http://my.clevelandclinic.org/disorders/back_pain/hic_acute_mechanical_back_pain.aspx (last accessed May 13, 2010).

4

> positive trigger points
> extremely painful 0-10 degrees
> Thoracic 30 degrees
> [deep tendon reflexes] 1/4
> [straight leg raise[7]]: positive on left at 45 degrees
> A: 846.0, recurrent [degenerative disc disease]; [follow up] in 2 months

(R. 110 (notes), 184 (staff interpretation), 228 (Prudential's interpretation of acronyms).)  Dr.

Altic's notes appear to indicate that he continued to treat her for back pain through February,

March, and/or April of 2006.  (R. 109.)

   Dr. Altic referred Carroll to Fairfield Medical Center for physical therapy, where she was

initially evaluated by Stacy Metz, MPT, on March 1, 2006.  (R. 68–69.)  At the evaluation,

Carroll complained of constant pain in her lower back, which she rated as "8/10 at the present

time and on average."  She stated that "sometimes she is unable to move secondary to her pain"

and reported that "sitting and standing a long period of time makes the pain worse," but "lying

flat on her back," "[r]est, massage[,] and heat . . . make the pain better."  She also stated that "her

pain gets worse after a long day at work, basic household activities and laundry and dishes" and

that "the pain has gotten progressively worse throughout the year."  Carroll also complained that

after each shift at work, "her pain gets up to a 10/10."  She reported that although she enjoys

sewing, she was unable to sit long enough to perform that activity, and she "has problems around

her house doing basic household cleaning."  She reported that she had been seeing a chiropractor

for approximately one year.  (R. 68.)

   Although Carroll told Metz that she "'walks crooked secondary to pain' every now and

then," Metz reported that Carroll "ambulated into the clinic in no apparent distress and [with] no

---

[7] The straight leg raise test is used to identify sciatica due to disc herniation.  Sidney M. Rubinstein & Maurits van Tulder, *A best-evidence review of diagnostic procedures for neck and low-back pain*, 22 BEST PRACTICE & RESEARCH CLINICAL RHEUMATOLOGY 471–82 (2008).  Sciatica is pain that radiates along the path of the sciatic nerve and its branches, from the spinal cord through the buttock and hip area and down the back of each leg.  THE MAYO CLINIC, *Sciatica*, http://www.mayoclinic.com/health/sciatica/DS00516 (last accessed May 18, 2010).

significant gait deviations," and that her sitting posture was within functional limits. Metz also

reported that Carroll "experiences pain with all trunk active [range of motion]" and "displays a

75% limitation with trunk flexion and extension" and "a 50% limitation in trunk side bending

and rotation in either direction." Metz rated the strength of Carroll's hip flexors as a "4/5 with

pain"; Carroll's other leg strength ratings were "4+/5" or "5/5." (R. 68.) Metz's report also

states that Carroll "has pain with palpation along the lumbar and thoracic spine" and

"experiences tingling and pain radiating down the [left lower extremity] after being on her feet a

long period of time." (R. 68.) Metz further reported:

> Straight leg raising in sitting is positive bilaterally with more pain experienced at
> the [left lower extremity]. FABER test[8] is positive with pain in the low back at
> end range with each lower extremity. [Patient's] hamstring flexibility is
> decreased slightly bilaterally. Femoral nerve sign, SI compression, and
> distraction tests are all negative bilaterally. Single knee to chest relieves the pain
> slightly at the [right lower extremity]. [Patient] is unable to perform single knee
> to chest in the [left lower extremity] secondary to pain and is unable to perform
> double knee to chest secondary to pain. Prone propping position reveals
> increased pain during and no change in pain after. Prone press-ups reveal no
> change in pain during or after.

(R. 68.)

Metz opined that Carroll "exhibits good rehab potential to achieve" certain short-term

and long-term goals. Short-term goals to be achieved in six visits included implementation of a

home exercise program, "decreas[ing] pain complaints in the low-back region to 4/5 on average

to increase tolerance to [activities of daily living] and work," and "improv[ing] trunk active

[range of motion] to a 25% deficit to increase functional mobility." (R. 68.) Long-term goals to

be achieved in twelve visits included increasing Carroll's tolerance of activities of daily living

and increasing her functional mobility by "[d]ecreas[ing] pain complaints to 2-3/10 on average,"

---

[8] The "FABER test," which stands for "flexion, abduction, and external rotation," is used to distinguish hip or
sacroiliac joint pathology from spine problems. Richard Rathe, MD, UNIV. OF FL., *Examination of the Extremities
and Back*, http://medinfo.ufl.edu/year1/bcs/clist/extrem.html (last accessed May 13, 2010).

"deny[ing] pain complaints with trunk active [range of motion]," "improve[ing] bilateral LE strength to 4+ to 5/5," "tolerat[ing] 30 minutes of exercise without increase[d] pain complaints," and "report[ing] an overall improvement in function to 70% of normal." (R. 69.) To achieve these goals, Metz recommended that Carroll be seen three times per week for four weeks for "therapeutic exercise [to] increase core strength and dynamic lumbar stabilization exercises." (R. 69.)

　　In the next two weeks, Carroll attended six physical therapy appointments, as recommended by Metz, who then prepared a "Progress Note" on March 13, 2006. Metz reported that Carroll was "unsure of amount of improvement since starting therapy." At that time, Carroll "rated her pain a 5-6/10 on average while at home and a 9/10 on average while at work," and "denie[d] the use of pain medication at this time." Metz reported that Carroll "experiences pain with all trunk [active range of motion]," her "trunk FLEX and EXT is limited by 50%," her "side-bending and rotation in either direction is [within functional limit]," and she "experiences pain with strength testing of the B hip FLEX." Metz reported that Carroll had tolerated the treatment without complaints, felt relief after use of a mechanical heating pad (as part of treatment), and had met only one short-term goal. Metz recommended that Carroll continue physical therapy two to three times per week for six more visits. (R. 67.)

　　On March 29, 2006, Metz reported that Carroll had attended six more visits but "notes no functional improvements with daily activities." Rather, Carroll reported that the pain was worse secondary to working twelve hour shifts and that she had "felt no lasting pain relief overall." She reported her pain as 9/10 on that date and reported taking medication. Upon evaluation, Carroll had "tenderness with palpation to her entire back region" and her strength had not

changed since March 13, 2006.  She had not met further goals as set forth in the initial evaluation.  (R. 66.)

On April 11, 2006, Carroll reported to the Bureau of Workers Compensation that she suffered from back pain and that her current medications consisted only of ibuprofen.  (R. 112.) On April 28, 2006, Dr. Altic began a series of six trigger-point injections.  (R. 105–08.)  The Court finds Dr. Altic's notes to be largely illegible, but Prudential interpreted them to indicate that Carroll's trigger-point injections concluded on June 6, 2006, when Dr. Altic prescribed aquatic therapy for Carroll's continued pain.  (R. 229.)

According to Prudential's records, when Carroll saw Dr. Altic on July 25, 2006, Dr. Altic took the following notes, as interpreted for Prudential by a staff person in Dr. Altic's office:

> No response to C9 letter[9] for physical therapy
> Chronic Low back pain
> Working as RN supervisor
> Physically getting more difficult and worse
> O: left [range of motion] painful in all planes
> Cervical with spasm/tenderness
> NVS (Amanda didn't know what this meant)
> [deep tendon reflexes] 1/4
> A: 722.2-getting worse

(R. 104 (notes), 184 (interpretation).)  On the same date, July 25, 2006, Dr. Altic reported that Carroll was permanently disabled, and Carroll discontinued her employment.  (R. 127, 138–41.) She reported to the Bureau of Workers Compensation that she suffered from back, hip, and leg pain and that her current medications included ibuprofen and Skelaxin.  (R. 111.)

Dr. Altic saw Carroll again on October 24, 2006, and while his examination notes are largely illegible, it is clear that Carroll complained of continued back pain and that Dr. Altic prescribed Skelaxin.  (R. 50.)  The same day, Carroll reported to the Bureau of Worker's

---

[9] A "C9 letter" is an Ohio Bureau of Workers' Compensation form requesting treatment. Ohio Bureau of Workers' Compensation, *OhioBWC – Provider – Form: (C-9) – Introduction*, http://www.ohiobwc.com/provider/forms/c9/default.asp (last accessed August 5, 2010).

Compensation that she suffered from pain in her back, hip, and leg and was taking Synthroid, ibuprofen, and Robitussin.  (R. 54.)  Dr. Altic's staff thereafter sought approval from the Ohio Bureau of Workers' Compensation for aquatic therapy, which was not authorized for several months.  (R. 49.)

Following Dr. Altic's referral for aquatic therapy, Carroll was again evaluated by a physical therapist at Fairfield Medical Center on November 15, 2006, this time by Corey Callahan, MPT.  (R. 51–52.)  Callahan reported the following:

> [Patient] presents to [physical therapy] with [complaints of] constant mid and low back pain rated 8/10 in average intensity. [Patient] describes pain as aching and "gripping".  [Patient] also notes intermittent [left lower extremity] aching and numbness to the toes.  [Patient] is unaware of what brings on these symptoms. [Patient] does note sitting for longer than 15 minutes or standing longer than 30 minutes increases her back pain severely. [Patient] notes lying on her back, use of moist heat and meds to some extent decrease symptoms. [Patient] reports difficulty sleeping and feels her symptoms continue to worsen overall.
>
> . . .
>
> [Patient] is an RN but has not worked since July 2006. . . . [Patient] enjoys sewing, gardening and housework but states her back pain interferes with these activities significantly.
>
> . . .
>
> O. OBSERVATION: [Patient] presents to [physical therapy] independently and in mild acute distress on this date. [Patient] is obviously in pain with supine to sit transfers and rolling on the plinth and arises from sitting slowly with a guarded posture. [Patient] exhibits protruding medial scapular borders bilaterally as well as mild forward head and rounded shoulders when standing.
>
> ROM: Active trunk [range of motion]; flexion and extension decreased 50% with increased upper and lower back pain, side bending L decreased 50% with increased bilateral back pain, side bending R decreased 50% with increased R low back pain, rotation bilaterally decreased 25% with upper thoracic discomfort bilaterally.   Bilateral [lower extremity] [range of motion] is [within normal limits].
>
> STRENGTH: Bilateral [lower extremity] strength is [within normal limits], with the exception of hip flexion, which is 4/5 bilaterally with increased low back pain. Hip abduction and adduction on the L tests 4 to 4+/5 with increased low back pain and knee extension and flexion on the L 4/5.

PALPATION: [Patient] is tender with even superficial palpation along thoracic and lumbar spinous processes and notes tenderness over bilateral thoracic and lumbar paraspinals throughout. [Patient] is also tender in the region of the L PSIS and surrounding soft tissue.

. . .

SPECIAL TESTS: Straight leg raise in sitting is negative. Straight leg raise in supine is positive bilaterally at approximately 30°. Hip flexion for increased low back pain. Hamstrings are mildly to moderately restricted bilaterally. [Patient] notes significant "pulling" with single or double knee to chest stretches. Prone propping on two pillows decreases low back pain but increases upper back pain.

GAIT: [Patient] ambulates independently over level surfaces demonstrating a slow and generally guarded gait.

. . .

A: [Patient] presents to [physical therapy] with significantly decreased trunk [range of motion], impaired movement patterns and gait quality and reports of significantly decreased functional ability. [Patient] exhibits fair to good rehab potential to achieve [specified] goals, given longstanding nature and severity of symptoms.

(R. 51.) Callahan identified the three short-term goals to be achieved in six visits: updating Carroll's home exercise program, "a decrease in average mid and low back intensity to 6/10 for the past 5 days to improve tolerance to daily activities," and an "increase in sitting tolerance to at least 30 min before exacerbation of symptoms." Callahan also identified the following long-term goals: correct compliance with Carroll's home exercise program, a "decrease in average mid and low back pain intensity to 4/10," "at least 25% improvement in qualify of sleep since beginning therapy," "at least 25% improvement in active trunk [range of motion] throughout to permit improved functional ability," and "at least 4+/5 strength throughout bilateral LE's to improve functional ability." (R. 51.) Callahan recommended that Carroll attend three aquatic therapy sessions per week for up to 18 visits. (R. 52.)

It appears that Carroll returned to Dr. Altic with continued back pain in December of 2006. (R. 49.) On December 5, 2006, she reported to the Bureau of Worker's Compensation

10

that she suffered from "pain in back over all[,] difficulty sleeping[,] [and] pain in legs at night";

she reported her current medications to be Skelaxin and Motrin. (R. 53.)

Carroll was examined by her chiropractors, Drs. Robert Sparks and Laura Sparks, on

March 20, 2007. (R. 28.) Drs. Sparks noted the following:

> [L]eft thoracic muscle tension, left lumbar muscle tension, left ilium high, right
> shoulder high, right thoracic muscle tension, right lumbar muscle tension, lumbar
> curvature to the right, patient avoids putting weight on right side, patient walks in
> stiff and guarded manner, cervical [illegible], lumbar [illegible], anterior deviation
> of the head and thoracic dishing at T3-T4.
>
> . . .
>
> On palpation, Palpatory Tenderness noted in lumbar region [illegible] through
> Sacrum – bilaterally.  On palpation, Muscle Spasm noted in the lumbar region at
> L-3, through, Sacrum – bilaterally.
>
> Orthopedic Examination
>
> Lasegue's Test[10] positive right with pain radiating into the right buttock, and thigh
>
> Kemp's Test[11] positive bilaterally, with pain
>
> Straight Leg Raise positive bilaterally at 16 degrees with pain radiating in to the
> right buttock and thigh
>
> Prognosis/Diagnosis
>
> . . .
>
> The patient's prognosis is guarded.  The patient should respond favorably to
> conservative chiropractic case management. . . . [Her] level of symptoms should
> decrease and [her] level of function should increase.
>
> Initially she should be seen 4 times for four weeks then re-evaluated to determine
> the effectiveness of the treatment.

(R. 28.) Drs. Sparks concluded that Carroll "for all practical purposes is disabled." (*Id.*)

**B.**   **Initial Denial of Benefits**

Carroll initially applied for benefits under the Plan in August of 2006. (R. 124–41.) In a

telephone interview on September 11, 2006, Carroll reported to Prudential that she had

---

[10] Lasegue's test is used to distinguish sciatica from disease of the hip joint. DORLAND'S ILLUSTRATED MEDICAL
DICTIONARY 1737 (31st ed. 2007).

[11] Kemp's test is used to diagnose disc and radicular pathology. K. Jeffrey Miller, *Test Combinations in Patient
Examination, Part 3: Testing by Indirect Method*, 3 DYNAMIC CHIROPRACTIC CANADA 1 (Jan. 1, 2010), *available at*
http://www.dynamicchiropractic.ca/mpacms/dc_ca/article.php?id=54310 (last accessed May 18, 2010).

participated in physical therapy, "but it was not effective," and that she was waiting for the
Bureau of Workers Compensation to approve aquatic therapy. (R. 174–75.) Carroll reported
that she "did not like to take medications and only took Skelaxin, prescribed by [her] doctor,
when the pain was intolerable." [12] (R. 175, 227.) She also reported that she can walk, "can sit
for a while, but not long periods w/o pain . . . cannot do gardening, can't do flowers . . . can't do
anything w/o pain . . . can't stand at kitchen sink w/o pain . . . iron w/o pain . . . mop floor w/o
pain, to sweep a floor gives a lot of pain." (R. 177–78.) She stated that she is able to drive an
automatic transmission car with a pillow behind her back, although "still she can't sit for long
periods." (R. 149.)

Prudential denied Plaintiff's application for benefits because it determined that she did
not meet the definition of "disability" under the Plan. (R. 227.) The Plan provides that a
participant is "disabled" when Prudential determines that she is "unable to perform the material
and substantial duties of [her] regular occupation due to [her] sickness or injury," is under a
doctor's regular care, and has at least a 20% loss in her monthly earnings due to the sickness or
injury. (R. 256 (emphasis omitted).) "Material and substantial duties" are those "normally
required for the performance of [the participant's] regular occupation" and which "cannot be
reasonably omitted or modified, except that if [the participant is] required to work on average in
excess of 40 hours per week, Prudential will consider [her] able to perform that requirement if
[she is] working or [has] the capacity to work 40 hours per week." (Id.) The participant's
"regular occupation" is that which she is "routinely performing when [her] disability begins,"
considered "as it is normally performed instead of how the work tasks are performed for a

---

[12] Carroll suggests that her ability to perform her duties as a charge nurse could have been compromised if she took
additional pain medications because such medications frequently decrease mental clarity and increase fatigue. (Pl.'s
Reply 4.) Prudential apparently agrees, having noted in its denial of benefits that Carroll was "not taking multiple
pain medications that would interfere with [her] functioning." (R. 230.) Carroll also reported to Prudential that pain
medications upset her stomach. (R. 175.)

specific employer or at a specific location." (*Id.*)  After 36 months of payments, a participant is "disabled" under the Plan when she is under a doctor's regular care and is "unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience." (*Id.* (emphasis omitted).)

Prudential based its denial of benefits on a determination that Plaintiff was "able to perform the material and substantial duties of [her] regular occupation," "as it is normally performed." (*See* R. 230; Def.'s Mot. 3.)  Prudential did not therefore reach the question of whether, after 36 months of benefit payments, Plaintiff was disabled from *any* gainful occupation. (Def.'s Mot. 3.)

A vocational report completed by Prudential noted that the "material and substantial duties" of Carroll's job would require her "to exert force to lift/carry push/pull objects 25-50 pounds occasionally, 10-25 pounds frequently, or up to 10 pounds constantly," and that she "may have need to walk and or stand frequently throughout the work day, and have frequent use of upper extremities for reaching, handling, or fingering items," and "may also frequently stoop." (R. 146.)  Prudential concluded in its initial denial letter that these requirements place Carroll's job in the "medium" strength category. (R. 230.)

On November 2, 2006, Prudential's Claim Manager Cheryl Berman recorded a note stating that "[Carroll] has not seen [physical therapy] since March '06, [and] [she] stopped working in July.  Confirmation of Last MRI was June of 6/5/05." Berman concluded that "[b]ased on previous review there was nothing to support impairment," and Carroll's "intensity and freque[n]cy of treatment do not support a change in her condition that would prevent her from working." (R. 152.)  Although Dr. Altic's office had again referred Carroll for therapy, and Carroll was then taking ibuprofen and Skelaxin, Berman stated that "[Carroll] [is] not taking pain

meds, [and is] not referred to [physical therapy] or pain management." (R. 152.) Finally,

Berman stated that "[there is] [n]o [diagnostic] testing at the time [Carroll] went out to also

indicate a change in her condition that would prevent her from working. [Carroll] does not treat

with ortho[,] only [primary care physician]." (R. 152.) Berman apparently did not consider

doctors' examinations, including administration of tests such as the straight leg raise and the

FABER test, to constitute diagnostic testing.

     The next day, Claim Manager Caroline Fahey Migueis, RN, reviewed Carroll's file and

observed that "[Dr. White] recommended physical medicine and possibly injections for pain

relief. However, it does not appear that [Carroll] has followed through with these

recommendations, nor that [she] has [followed up] with [Dr. White] since 2005." (R. 154.)[13]

     Migueis further noted that "Since going out of work [Carroll] was seen by Dr. Altic (pcp)

on 7/25/2006 and [complained of] worsening back pain. However, physical exams do not appear

to reflect a significant worsening of her function related to her [complaints of] worsening back

pain when compared to 2/1/2006 office visit note from Dr. Altic." (R. 154.) In fact, Carroll's

physical examinations demonstrate that her condition deteriorated between February 1 and July

25 of 2006. On February 1, Dr. Altic's examination notes indicate that Carroll's lumbar range of

motion was "extremely painful 0-10 degrees" (R. 110, 184); on July 25, he noted that her range

of motion was "painful in all planes." (R. 104, 184.) He also noted on July 25, 2006 that her

condition was "[p]hysically getting more difficult and worse." (R. 104, 184.)

---

[13] For reasons not apparent from the record, it is correct that some, but not all, of Dr. White's recommendations to Dr. Altic were implemented. Dr. White wanted to obtain additional scans of Carroll's spine and suggested a follow-up appointment following the completion of his recommended treatment. The record contains no evidence of additional scans or a follow-up appointment with Dr. White. As Migueis noted, Dr. White also recommended "physical medicine modalities in [Dr. Altic's] office to include back stabilization techniques, stretching and strengthening exercises." While it is unclear whether Dr. Altic's office directly provided such care, Dr. Altic did refer Carroll to physical therapy, which she completed. Finally, Dr. White noted that Carroll "may benefit" from facet blocks and ultimately may need a provocative discography. Although Dr. Altic prescribed and administered trigger point injections, Carroll did not obtain facet blocks and apparently has not undergone a provocative discography.

Migueis further stated that Carroll "has not had an updated MRI, has not been in [physical therapy] since 3/2006, and currently only treats on occasion with pcp for her [complaints of] back pain." Migueis did not mention the fact that although Carroll had found physical therapy to be ineffective in March of 2006, Dr. Altic had prescribed aquatic therapy in April of 2006. The Bureau of Workers' Compensation did not approve such therapy until November of 2006, when the therapy began.

Finally, without noting that Carroll had expressed concern about the side effects of additional pain medications, Migueis found that "it does not appear that [Carroll] requires multiple pain medications or frequent trips to the ER due to uncontrollable back pain." She concluded that "it does not appear that there has been a significant change in [Carroll]'s condition, nor does the intensity or frequency of [her] treatment appear to support an impairment from at least medium duty work." (R. 154.)

Claim Manager Nancy Tortoreti reviewed Carroll's file on November 7, 2006. Tortoreti noted some of the findings of Drs. White and Altic and made the following comments, largely repeating those of Migueis:

> [Dr. White] recommended physical medicine and possibly injections for pain relief. However, it does not appear that [Carroll] has followed through with these recommendations, nor that [she] has [followed up] with [Dr. White] since 2005. ... Although Dr. Altic's notes from the 7/25/2006 ov indicate [Carroll] had [complaints of] worsening back pain, the physical exam does not appear to reflect a significant worsening of [her] function related to her [complaints of] worsening back pain when compared to 2/1/2006 office visit note from Dr. Altic. [Carroll] has not had an updated MRI, it is unclear how long [physical therapy] lasted,[14] and currently only treats on occasion with [a primary care physician] for her [complaints of] back pain. Additionally, it does not appear that [she] requires multiple pain meds, and [she] reports only OTC medications, or frequent trips to the ER due to uncontrollable back pain. While [Carroll] did undergo a series of trigger point injections, these shots would have been to address muscular pain, not radicular pain. Although [she] has been awaiting authorization to undergo aqua

---

[14] A review of the administrative record makes clear the duration of Carroll's multiple 2006 physical therapy sessions. (*See* R. 66, 67.)

15

therapy, again, the lack of intensity of this [treatment/therapy], would not support pain so severe that [she] would be unable to function in her job as an RN.

(R. 157–58.)

Although the Plan provides that Prudential can require examinations by medical practitioners or vocational experts of its choice (R. 256), Prudential did not request Plaintiff to undergo any examinations.  Prudential instead based its initial decision solely on the conclusions reached by Berman, Migueis, and Tortoreti following their review of Plaintiff's file.

As set forth below, Prudential explained its decision to deny benefits in a section of the letter headed "Summary":

> In August 2005, Dr. White[] reviewed your June 2005 MRI and recommended physical medicine modalities and possibly facet injections for pain relief.  You have stated [that] you did undergo chiropractic treatment without pain relief.  You also underwent physical therapy treatment in March 2006 and trigger point injections, for muscular pain, between April 2006 and June 2006.  Since Dr. Altic's July 25, 2006 office visit note indicates that you continued your complaints of back pain, it is reasonable to infer that these modalities also did not address your pain.  You have stated that you rely on Ibuprofen for pain relief, with only occasional use of Skelaxin.  While none of these treatments alleviated your pain, you did remain at work, and it is unclear what changed in your chronic condition or in your treatment plan to prompt you to go out of work on July 25, 2006.  The physical exam findings contained in Dr. Altic's notes do not document a significant worsening in your ability to function in your job as a nurse, and there are no current diagnostic test results to document that your back condition has worsened over time.  You are not taking multiple pain medications that would interfere with your functioning, and there is no documentation that your pain has caused you to seek emergent care.  In your October 31, 2006 phone call, you did state that you had been approved for aquatic therapy.  However, it had not yet begun.

> While we acknowledge your symptom of pain, based on the medical information reviewed, it does not appear that there has been a significant change in your condition, nor does the intensity or frequency of your treatment appear to support an impairment from at least medium duty work.  Since the occupation of a nurse is a medium level job, we have determined that you maintain the functional capacity to perform this job; and your claim . . . has been disallowed.

(R. 229–30.)

## C.    Denial Following First Appeal

Carroll appealed the original denial of benefits under the Plan on November 14, 2006. (R. 58.) Prudential responded by hiring a private investigator to monitor Carroll's activities (R. 41) and requesting Dr. Michael W. Weiss of MLS National Medical Evaluation Services, Inc. to conduct an "Independent Peer Review" of Carroll's file (R. 31–35, 201–02).

It appears that the investigator did not conduct actual surveillance, but reported that Carroll's neighbors stated that Carroll had been observed departing her house at various times of the day and frequently babysits her grandchildren several times a week. (R. 41, 45.)  Carroll's neighbors also stated that if Carroll's husband is present, he usually does the driving, and that Carroll usually visits Lancaster, Ohio to attend medical appointments and purchase groceries and household goods. (R. 45.)

In his report to Prudential, Dr. Weiss summarized the findings of Carroll's 2002 x-ray, 2005 MRI, and 2005 consultation with Dr. White.  His report noted that Carroll underwent six trigger point injections and attended twelve sessions of physical therapy. (R. 32.)  He described in depth the evaluation performed by a physical therapist on November 15, 2006, but apparently disregarded the therapist's note that Carroll was "obviously in pain." (R. 32.)

Based on these observations, Dr. Weiss concluded that as of July 25, 2006, Carroll "does have a minimal degree of functional impairment prophylactically," and that the "multilevel degenerative findings throughout the lumbar spine is supported by MRI imaging and also corresponds to some mild clinical deficit, as noted on the neurosurgical consultation visit of 8/23/05." (R. 33.)  He went on to state erroneously that on March 1, 2006, Carroll's "[r]ange of motion was reduced to 75 percent of normal, particularly with trunk flexion and extension." (R. 33.)  In fact, the records indicate that on March 1, 2006, Carroll "display[ed] a 75% limitation

with trunk flexion and extension," *not* that her range of motion was reduced to 75% of normal. (R. 68.) That Carroll's limitation was reported in March of 2006 as being 25% of normal is made clear by the physical therapist's goals of "improv[ing] trunk active [range of motion] to a 25% deficit" and an "overall improvement in function to 70% of normal." (R. 68, 69.)

Dr. Weiss also stated that, on March 1, 2006, "Carroll was noted to ambulate with no apparent distress and no significant gait deviations. *Similar such findings were again noted in the initial evaluation . . . on 11/15/06.*" (R. 34 (emphasis added).) While this was true in March of 2006, the therapist in November reported sharply different observations. He noted that Carroll presented "in mild acute distress," was "obviously in pain," "[arose] from sitting slowly with a guarded posture," and displayed "impaired movement patterns and gait quality." (R. 51.)

Finally, Dr. Weiss concluded that "[t]he available medical records . . . do not support significant functional impairment." (R. 34.) He found that "[t]here is nothing to suggest that the claimant's self reported chronic pain is supported by any diagnostic testing or physical examination findings," Carroll "has no evidence of significant loss of motion," and "the vast majority of her physical examination is entirely within normal limits." (R. 34.)

Essentially adopting Dr. Weiss's findings, Prudential affirmed its denial of benefits on January 12, 2007. (R. 220.) In a letter explaining the decision, Prudential concluded that:

> [Y]our overall degree of impairment and resulting restrictions is (sic) not at all significant. There is nothing to suggest that your self reported chronic pain is supported by any diagnostic testing or physical examination findings. . . . You have no evidence of significant loss of motion . . . and the vast majority of her (sic) physical examination is entirely within normal limits.

(R. 223.) Prudential concluded, "based on the physician reviewer's opinion, there is no medical support that you would have been precluded [from] performing the material and substantial duties of your regular occupation." (R. 223.)

**D.    Denial Following Second Appeal**

Carroll appealed a second time on March 27, 2007, providing additional examination

notes from Dr. Sparks, dated March 20, 2007.  (R. 27, 28.)  At Prudential's request (R. 225), Dr.

Weiss reviewed the additional records and confirmed his previous conclusion (R. 24–26).  In his

report to Prudential, Dr. Weiss gave a detailed description of parts of Dr. Sparks' notes.  He

excluded, however, Dr. Sparks' observations that Carroll "avoid[ed] putting weight on [the] right

side" and "walk[ed] in stiff and guarded manner" as well as his report of muscle spasm on

palpation in the lumbar region and a positive Kemp's Test bilaterally with pain.  (R. 24, 28.)  Dr.

Weiss concluded that "[t]he additional medical documentation . . . in no way provides additional

information that would alter the previously outlined assessment."  (R. 25.)  He explained that

Carroll's "self-described complaints certainly outweighed corresponding clinical and

neurological exam findings," noting that "surveillance reports indicated that she was able to

drive a car to shop and baby-sit for her grandchildren."  (R. 25.)  According to Dr. Weiss, Carroll

"continues to have a lack of significant clinic or neurological abnormality to account for the

degree of her pain complaints."  (R. 26.)  Based on Dr. Weiss's report, Prudential again denied

benefits on May 10, 2007.  (R. 197.)

## II.

A participant or beneficiary of an ERISA-governed plan may bring a civil action under

ERISA "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights

under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the

plan."  29 U.S.C. § 1132(a)(1)(B).

In reviewing a denial of benefits under an ERISA-governed plan, the Court applies the

arbitrary and capricious standard of review if the benefit plan granted its administrator

19

discretionary authority to interpret the terms of the plan and to determine eligibility for benefits. *Balmert v. Reliance Std. Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)). In this case, the Summary Plan Description provides that Prudential "has the sole discretion to interpret the terms of the [Plan], to make factual findings, and to determine eligibility for benefits." (R. 287.) The parties agree that the Plan thus effectively delegated discretionary authority to Prudential so that the arbitrary and capricious standard applies. (Pl.'s Mot. 11; Def.'s Mot. 9 (citing R. 287).)

Under the arbitrary and capricious standard, the Court upholds a plan administrator's decision "'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Id.*, 601 F.3d at 501 (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). "'[T]he federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions,'" however. *Balmert*, 601 F.3d at 501 (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005)). Although the arbitrary and capricious standard is extremely deferential, "[i]t is not . . . without some teeth . . . Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citations and quotations omitted).

In determining whether a decision was arbitrary and capricious, the Court factors in whether a conflict of interest exists. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 2346 (2008). A conflict of interest exists when, as in this case, an insurance company is both the administrator rendering eligibility determinations and the insurer responsible for paying the benefits out of its own pocket. *Id.*, 128 S. Ct. at 2346. The Court "should consider that

20

conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[,] and . . . the significance of the factor will depend upon the circumstances of the particular case." *Id.*, 128 S. Ct. at 2346. A conflict of interest has greater importance "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and has less importance "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*, 128 S. Ct. at 2351. The record contains no evidence to suggest that Prudential has a history of biased claims administration or that it has taken steps to reduce the potential for bias or to promote accuracy. Accordingly, the Court gives Prudential's conflict of interest neither greater nor lesser weight and simply considers it as one factor in determining whether it arbitrarily and capriciously denied Plaintiff's claim for benefits.

### III.

Carroll's treating primary care physician, Dr. Altic, opined that Carroll was permanently and totally disabled as of July 25, 2006; her treating chiropractors noted a similar conclusion on March 20, 2007. (R. 28, 127, 138–41; *see* R. 228.) Before reaching this conclusion, Dr. Altic had spent at least a year treating Carroll for her back pain, having ordered an MRI, referred her for a neurosurgical spine consultation, ordered physical therapy, and administered a series of trigger-point injections. He saw her for numerous appointments during this time and received the MRI interpretation as well as reports from the consulting neurosurgeon and the physical therapists. (R. 48–50, 77, 81, 102–10, 229.) Dr. Altic and Carroll's other care providers had

21

administered standard diagnostic tests including the straight leg raise and the FABER Test.[15]  (R. 68, 110, 184.)  His examination notes indicate that Carroll's back pain was worsening:  On February 1, 2006, her lumbar range of motion was "extremely painful 0-10 degrees"; on July 25, it was "painful in all planes" and her condition was "[p]hysically getting more difficult and worse."  (R. 104, 110, 184.)

Dr. Altic's opinion that Carroll is disabled is supported by objective evidence of Carroll's back problems.  An x-ray and notes by Dr. Robert Sparks show that Carroll suffered from back problems as early as 2002:  "[p]ostural alterations and rotational malpositions suggesting papa spinal muscular guarding"; "[a]ltered biomechanics of the cervical, thoracic, and lumbar spine"; "[i]ntersegmental joint malposition of the cervical, thoracic, and lumbar spine"; and "[m]ild to moderate degenerative joint disease at C7 and L5."  (R. 73.)  The 2005 MRI shows multilevel spondyloarthropathy, bilateral facet disease, and disc protrusions causing foraminal stenosis.  (R. 78, 81–82.)  Dr. White's August 2005 examination showed "tenderness from L3 to S1 with spasm."  (R. 81–82.)  The physical therapist noted in March of 2006 that Carroll "display[ed] a 75% limitation with trunk flexion and extension," "a 50% limitation in trunk side bending and rotation in either direction," and positive results for the straight leg raising and FABER tests.  (R. 68.)  In addition, Dr. Altic's conclusion that Carroll is disabled was corroborated by Drs. Sparks, who also concluded that Carroll was unable to work.  No treating or examining physician has reached a contrary conclusion.

Prudential disagreed with Plaintiff's treating physician.  As discussed above, Prudential's first employee to review the file, Claim Manager Berman, incorrectly stated that Carroll was not taking pain medications, had not been referred to physical therapy, and had not undergone diagnostic testing.  (R. 152.)  Claim Manager Migueis stated in conclusory fashion that Carroll

---

[15] Lasegue's Test and Kemp's Test were also administered after July 25, 2006.  (R. 28, 51.)

had not followed up with Dr. White's recommendations to get "physical medicine and possibly injections for pain relief" despite the fact that Carroll had obtained physical therapy and trigger point injections. (R. 154.)  Migueis also concluded that Dr. Altic's "physical exams do not appear to reflect a significant worsening of [Carroll's] function" from February 1, 2006 to July 25, 2006, while the notes actually indicate significant deterioration, as described above. (R. 154; *see* R. 110, 184.)  Migueis also stated that Carroll had not been in physical therapy since March of 2006, ignoring the fact that Dr. Altic had referred Carroll for further therapy and his staff was then working on obtaining approval for its payment.  Finally, she noted that "it does not appear that [Carroll] requires multiple pain medications," but did not address the potential effect that such medications might have on Carroll's ability to perform her duties as a nurse or her complaint that pain medications upset her stomach. (R. 154, 175, 230.)  Claim Manager Tortoreti's notes largely repeat the conclusions made by Berman and Migueis. (R. 157–58.)  Tortoreti further demonstrates her cursory review of the medical record, however, by noting that "it is unclear how long [physical therapy] lasted" (R. 158)—an answer easily obtained by reviewing the physical therapist's progress note (R. 67) and discharge summary (R. 66).

Although the Plan allows Prudential to require Carroll to undergo examinations by medical practitioners of its choice (R. 256), and despite the fact that Carroll's treating physician found her to be disabled, Prudential based its initial denial of benefits—contradicting the treating physician's conclusion—solely on the records reviews performed by Berman, Migueis, and Tortoreti, none of whom is a doctor and none of whom personally met with or examined Carroll.

When Carroll appealed the initial denial of benefits, Prudential engaged a physician to review her file.  While Dr. Weiss summarized the record in some detail, he misstated important facts.  First, he stated erroneously that on March 1, 2006, Carroll's "[r]ange of motion was

reduced to 75 percent of normal, particularly with trunk flexion and extension," when the records

actually indicate that her range of motion was at that time reduced *by*, not *to*, 75%. (R. 33, 68–

69.) Dr. Weiss also stated that the same positive observations regarding Carroll's ambulation

and gait were made by physical therapists on March 1 and November 15 of 2006. (R. 34.) In

fact, sharply different observations were made on these dates; the November observation noted

that Carroll was "in mild acute distress," was "obviously in pain," "[arose] from sitting slowly

with a guarded posture," and displayed "impaired movement patterns and gait quality." (R. 51.)

While conceding that Carroll had "a minimal degree of functional impairment prophylactically,"

he concluded that the records "do not support significant functional impairment," "[t]here is

nothing to suggest that the claimant's self reported chronic pain is supported by any diagnostic

testing or physical examination findings," and she "has no evidence of significant loss of

motion." (R. 33–34.) Adopting Dr. Weiss's conclusions, Prudential affirmed its denial of

Carroll's claim.

When Carroll applied for a second reconsideration and submitted additional records,

examination notes by Drs. Sparks, Prudential again employed Dr. Weiss to review the records

and make a recommendation. In his report to Prudential, Dr. Weiss gave a detailed description

of portions of Drs. Sparks' notes. (R. 24–26) He excluded, however, the doctors' observations

that Carroll "avoid[ed] putting weight on [the] right side" and "walk[ed] in stiff and guarded

manner" as well as his report of muscle spasm on palpation in the lumbar region and a positive

Kemp's Test bilaterally with pain. (R. 24, 28.) Dr. Weiss concluded that "[t]he additional

medical documentation . . . in no way provides additional information that would alter the

previously outlined assessment." (R. 25.) Prudential again adopted Dr. Weiss's opinion and

affirmed the denial of benefits.

From the foregoing, the Court concludes that Prudential acted arbitrarily and capriciously and that its decision denying long-term disability benefits to Plaintiff must be reversed.

Furthermore, the Court finds that the record clearly establishes that Plaintiff is disabled under the first definition in the Plan and that she is therefore entitled to judgment in her favor. "'[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which [s]he was clearly entitled," 'remand to the plan administrator is the appropriate remedy. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)). Although the Court questions the decision-making process here, the record also clearly establishes that Plaintiff is entitled to benefits as to the first 36 months of eligibility. Plaintiffs' treating physicians, as well as Drs. Sparks, based their opinions on objective medical evidence. The contrary opinion of Prudential's hired physician, based upon erroneous medical information, is not entitled to countervailing weight for the reasons set forth above. *See Cooper*, 486 F.3d at 172–73; *Kalish v. Lib. Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 513 (concluding that the appropriate remedy was an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it had previously ignored).

The Court finds that Plaintiff was disabled for purposes of the first 36 months of payments, as of July 25, 2006. (*See* R. 129, 256.) Because the Plan provides that "[b]enefits begin the day after the [90-day] Elimination Period is completed" (R. 239), Plaintiff is entitled to 36 months of retroactive benefits beginning on October 23, 2006. Because Prudential did not reach the question of whether Plaintiff is disabled under the second definition in the Plan, applicable "[a]fter 36 months of payments" (R. 256), the Court remands this matter to Prudential for such a determination consistent with this Opinion and Order.

25

## IV.

For the reasons set forth above, the Court hereby **GRANTS** Plaintiff Lucille Carroll's motion (Document 21) and **DENIES** Defendant Prudential Insurance Company of America's motion (Document 20).  The Court hereby **DIRECTS** Prudential to award Plaintiff retroactive benefits under the Long-Term Disability Plan for the 36-month period beginning on October 23, 2006 and **REMANDS** this matter to Prudential to determine whether Plaintiff meets the definition of "disability" for the period following the first 36 months of eligibility.  The Court **DIRECTS** the Clerk to enter judgment for Plaintiff.

**IT IS SO ORDERED.**

8 - 5 - 2010
**DATED**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**

26